Form **1120X** (Rev. December 2001) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ DECEMBER 1996 (Enter month and year.)

Name: MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY (CONSOLIDATED)

Employer identification number: 04-1590850

Please Type or Print

Number, street, and room or suite no. (If a P.O. box, see instructions.): 1295 STATE STREET MIP:E171

City or town, state, and ZIP code: SPRINGFIELD, MA 01111-0001

Telephone number (optional): (413) 744-7684

Enter name and address used on original return (If same as above, write "Same."): SAME

Internal Revenue Service Center where original return was filed ▶ ANDOVER, MA

## Fill in Applicable Items and Use Part II To Explain Any Changes

**Part I** Income and Deductions (see instructions)

| | | (a) As originally reported or as previously adjusted | (b) Net change increase or decrease - explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | | | |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | | | |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 1,069,725,403 | (159,048,074) | 910,677,329 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 364,991,918 | (55,666,826) | 309,325,092 |

### Payments and Credits (see instructions)

| | | (a) | (b) | (c) |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit | 5a | 8,556,029 | | 8,556,029 |
| b Estimated tax payments | b | 295,168,618 | | 295,168,618 |
| c Refund applied for on Form 4466 | c | | | |
| d Subtract line 5c from the sum of lines 5a and 5b | d | 303,724,647 | | 303,724,647 |
| e Tax deposited with Form 7004 | e | 115,866,124 | | 115,866,124 |
| f Credit from Form 2439 | f | | | |
| g Credit for Federal tax on fuels FORM 2439 | g | 3,256 | | 3,256 |

| | | |
|---|---|---|
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | |
| 7 Add lines 5d through 6, column (c) | 7 | 419,594,027 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | 54,602,109 |
| 9 Subtract line 8 from line 7 | 9 | 364,991,918 |

### Tax Due or Overpayment (see instructions)

| | | |
|---|---|---|
| 10 **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury."** ▶ | 10 | |
| 11 **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 55,666,826* |
| 12 Enter the amount of line 11 you want: **Credited to 20** estimated tax ▶ **Refunded** ▶ | 12 | 55,666,826* |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer RICHARD BOURGEOIS | 2/28/05 Date | ▶ SENIOR VICE PRESIDENT Title CORPORATE TAX

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

**For Paperwork Reduction Act Notice, see page 4.** Form **1120X** (Rev. 12-2001)

JSA 3C1820 1.000

* PLUS ANY OTHER AMOUNT LEGALLY REFUNDABLE, PLUS INTEREST.

Form 1120X (Rev. 12-2001) Page 2

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here ▶ ☐

1. SEE ATTACHED "FORM 1120L RECOMPUTATION PER CLAIM FOR REFUND."

2. SEE ATTACHED "ADDENDUM TO 1996 CLAIM FOR REFUND."

**Massachusetts Mutual Life Ins. Co. -- Tax Year 1996**
**Form 1120L Recomputation Per Claim for Refund**

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| **Tax Computation** | | | | | |
| 1. Life Subgroup LICTI | | | | | |
| MassMutual (page 1) | $952,508,930 | | $840,501,628 | | $681,453,554 |
| RAR adjustment | $0 | | $0 | | $0 |
| MML Baystate | $17,729,071 | | $17,729,071 | | $17,729,071 |
| SIA DRD Adjustment | $0 | | ($463,272) | | ($463,272) |
| Subtotal | $970,238,001 | ($112,470,574) | $857,767,427 | ($159,048,074) | $698,719,353 |
| 2. NonLife Subgroup TI | | | | | |
| 5yr+ Members | $198,767,623 | | $198,767,623 | | $198,767,623 |
| 5yr- Members | $14,956,676 | | $14,956,676 | | $14,956,676 |
| Adjustments | $21,654 | | $21,654 | | $21,654 |
| Subtotal | $213,745,953 | | $213,745,953 | | $213,745,953 |
| 3. Cap. Loss C/B from 99 | ($1,787,977) | | ($1,787,977) | | ($1,787,977) |
| 4. Total Consolidated TI | $1,182,195,977 | ($112,470,574) | $1,069,725,403 | | $910,677,329 |
| 5. Regular Tax | | | | | |
| TI @ 35% | $413,768,592 | | $374,403,891 | | $318,737,065 |
| MD gains differential | ($1,805,702) | | ($1,805,702) | | ($1,805,702) |
| Total Regular Tax | $411,962,890 | | $372,598,189 | | $316,931,363 |
| 6. Total Credits | ($7,606,271) | | ($7,606,271) | | ($7,606,271) |
| 7. Balance | $404,356,619 | | $364,991,918 | | $309,325,092 |
| 8. Total Tax Per RAR | $404,356,619 | | | | |
| 9. Total Tax Per Appeals | | | $364,991,918 | | |
| 11. Total Tax Per Claim | | | | | $309,325,092 |
| 12. Tax as Last Adjusted | $378,823,375 | | $378,823,375 | | $364,991,918 |
| 13. Overassessment or (Deficiency) | ($25,533,244) | | $13,831,457 | | $55,666,826 |

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| **Page 1 -- LICTI** | | | | | |
| 1. Gross Premiums | $5,029,888,754 | | $5,029,888,754 | | $5,029,888,754 |
| Less Return Premiums | $0 | | $0 | | $0 |
| | $5,029,888,754 | | $5,029,888,754 | | $5,029,888,754 |
| 2. Sec. 807(f)(1)(B)(ii) | $6,763,881 | | $6,763,881 | | $6,763,881 |
| 4. 3 1/3% of YE Bal | $5,380 | | $5,380 | | $5,380 |
| 5. Investment Income | $3,129,184,350 | | $3,129,184,350 | | $3,129,184,350 |
| 6. Net Capital Gain | $141,528,989 | $0 | $141,528,989 | | $141,528,989 |
| 8. Other Amounts | ($1,243,897) | $0 | ($1,243,897) | | ($1,243,897) |
| 9. Gross Income | $8,306,127,457 | | $8,306,127,457 | | $8,306,127,457 |
| | | | | | |
| 10. Death Benefits | $5,270,410,815 | | $5,270,410,815 | | $5,270,410,815 |
| 11. Increase in Reserves | $76,420,570 | $13,813,154 | $90,233,723 | $2,024,650 | $92,258,374 |
| 12. Sec. 807(f)(1)(B)(i) | $5,895,347 | | $5,895,347 | | $5,895,347 |
| 13. Policyholder Dividends | $725,481,904 | $55,288,210 | $780,770,114 | $39,007,398 | $819,777,511 |
| 14. Assumption Reins | $0 | | $0 | | $0 |
| 17. Policy Acq Exp | $88,759,134 | | $88,759,134 | | $88,759,134 |
| 19. Other Deductions | $1,172,755,478 | $24,641,137 | $1,197,396,615 | $117,736,616 | $1,315,133,231 |
| | | | | | |
| 20. DRD | $27,850,772 | | $46,115,574 | | $46,394,984 |
| 21. Operations Loss | $0 | | $0 | | $0 |
| 22. Total Deductions | $7,367,574,020 | $112,007,302 | $7,479,581,322 | $159,048,074 | $7,638,629,396 |
| | | | | | |
| 23. Gain From Operations | $938,553,437 | ($112,007,302) | $826,546,135 | | $667,498,061 |
| 26. Separate Account | $13,955,493 | | $13,955,493 | | $13,955,493 |
| | | | | | |
| 28. LICTI | $952,508,930 | ($112,007,302) | $840,501,628 | ($159,048,074) | $681,453,554 |

| | | | | | |
|---|---|---|---|---|---|
| **Schedule A -- Dividends and DRD** | | | | | |
| 10. Gross DRD | $7,638,575 | | $7,638,575 | | $7,638,575 |
| 11. Company Share | 30.6083% | | 30.2706% | | 33.9285% |
| 12. | $2,338,036 | | $2,312,242 | | $2,591,652 |
| | | | | | |
| 13. SIA DRD write in | $25,512,736 | $18,290,596 | $43,803,332 | | $43,803,332 |
| | | | | | |
| 16. Total | $27,850,772 | | $46,115,574 | | $46,394,984 |

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| **Schedule B -- Gross Investment Income** | | | | | |
| 1. Interest | $2,602,828,903 | $0 | $2,602,828,903 | | $2,602,828,903 |
| 2. Dividends | $45,360,972 | | $45,360,972 | | $45,360,972 |
| 3. Rents | $267,752,979 | | $267,752,979 | | $267,752,979 |
| 4. Royalties | $151,869 | | $151,869 | | $151,869 |
| 5. Leases, etc. | $3,713,548 | | $3,713,548 | | $3,713,548 |
| 6. STCG over LTCL | $72,041,975 | | $72,041,975 | | $72,041,975 |
| 7. Noninsurance Income | $137,334,104 | | $137,334,104 | | $137,334,104 |
| 8. Investment Income | $3,129,184,350 | | $3,129,184,350 | | $3,129,184,350 |
| 9. T/E Interest | $563,099 | | $563,099 | | $563,099 |
| 10. Total | $3,129,747,449 | | $3,129,747,449 | | $3,129,747,449 |
| 11. 100% Dividends | $24,128,010 | | $24,128,010 | | $24,128,010 |
| 12. Gross Inv Income | $3,105,619,439 | | $3,105,619,439 | | $3,105,619,439 |
| | | | | | |
| **Schedule C -- Section 809 DEA** | | | | | |
| DECEMBER 31, 1995 | | | | | |
| 1. | $2,285,357,986 | | $2,285,357,986 | | $2,285,357,986 |
| 2. | $80,505,628 | | $80,505,628 | | $80,505,628 |
| 3. | $569,934,630 | | $569,934,630 | | $569,934,630 |
| 4. | $59,520,943 | | $59,520,943 | | $59,520,943 |
| 5.a. | $582,796,297 | | $582,796,297 | | $582,796,297 |
| 5.b. | $97,830,906 | | | | |
| 6. | $169,488,375 | | $169,488,375 | | $169,488,375 |
| 7. | $411,257,415 | | $411,257,415 | | $411,257,415 |
| 8.a. | $4,256,692,180 | $239,666 | $4,256,931,846 | ($268,241,553) | $3,988,690,293 |
| 8.b. | $0 | | $0 | | $0 |
| 8.c. | $4,256,692,180 | | $4,256,931,846 | | $3,988,690,293 |
| | | | | | |
| DECEMBER 31, 1996 | | | | | |
| 1. | $2,320,984,540 | | $2,320,984,540 | | $2,320,984,540 |
| 2. | $89,304,429 | | $89,304,429 | | $89,304,429 |
| 3. | $685,993,015 | | $685,993,015 | | $685,993,015 |
| 4. | $71,721,100 | | $71,721,100 | | $71,721,100 |
| 5.a. | $707,911,476 | | $707,911,476 | | $707,911,476 |
| 5.b. | $143,519,014 | | | | |
| 6. | $189,489,738 | | $189,489,738 | | $189,489,738 |
| 7. | $437,538,021 | | $437,538,021 | | $437,538,021 |
| 8.a. | $4,646,461,333 | ($13,575,389) | $4,632,885,944 | ($299,045,770) | $4,333,840,174 |
| 8.b. | $0 | | $0 | | $0 |
| 8.c. | $4,646,461,333 | | $4,632,885,944 | | $4,333,840,174 |
| | | | | | |
| 9. Total | $8,903,153,513 | | $8,889,817,790 | | $8,322,530,467 |
| 10. 50% of Total | $4,451,576,757 | | $4,444,908,895 | | $4,161,265,234 |
| 11. | $0 | | $0 | | $0 |
| 12. Average Equity Base | $4,451,576,757 | | $4,444,908,895 | | $4,161,265,234 |
| 13. Times DER = DEA | $286,993,153 | | $286,563,276 | ($18,286,507) | $268,276,770 |

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| **Schedule E -- Policyholder Dividends** | | | | | |
| 1. Paid or Accrued | $809,148,899 | $54,858,333 | $864,007,232 | $20,720,891 | $884,728,123 |
| 2. Excess Interest | $35,818,106 | | $35,818,106 | | $35,818,106 |
| 3. Premium Adjustments | $167,508,052 | | $167,508,052 | | $167,508,052 |
| 4. Experience Refunds | $0 | | $0 | | $0 |
| 5. Total | $1,012,475,057 | | $1,067,333,390 | | $1,088,054,281 |
| 6. DEA | $286,993,153 | | $286,563,276 | | $268,276,770 |
| 7. Deductible Dividends | $725,481,904 | $55,288,210 | $780,770,114 | | $819,777,511 |
| 8. | $0 | | $0 | | $0 |
| 9. Deductible Percentage | 71.6542989% | | 73.1514746% | | 75.3434388% |
| | | | | | |
| **Schedule F -- Increase in Reserves** | | | | | |
| JANUARY 1, 1996 | | | | | |
| 1. Section 807(c)(1) | $24,611,700,698 | | $24,611,700,698 | | $24,611,700,698 |
| 2. Section 807(c)(2) | $34,753,739 | | $34,753,739 | | $34,753,739 |
| 3. Section 807(c)(3) | $304,657,166 | | $304,657,166 | | $304,657,166 |
| 4. Section 807(c)(4) | $7,220,310,886 | | $7,220,310,886 | | $7,220,310,886 |
| 5. Section 807(c)(5) | $288,632,680 | | $288,632,680 | | $288,632,680 |
| 6. Section 807(c)(6) | $0 | | $0 | | $0 |
| 7. | $32,460,055,169 | ($239,666) | $32,459,815,503 | $18,247,550 | $32,478,063,053 |
| | | | | | |
| DECEMBER 31, 1996 | | | | | |
| 1. Section 807(c)(1) | $25,841,628,094 | | $25,841,628,094 | | $25,841,628,094 |
| 2. Section 807(c)(2) | $35,147,162 | | $35,147,162 | | $35,147,162 |
| 3. Section 807(c)(3) | $305,837,543 | | $305,837,543 | | $305,837,543 |
| 4. Section 807(c)(4) | $6,093,232,972 | | $6,093,232,972 | | $6,093,232,972 |
| 5. Section 807(c)(5) | $261,020,712 | | $261,020,712 | | $261,020,712 |
| 6. Section 807(c)(6) | $0 | | $0 | | $0 |
| RAR adjustment | $0 | | $0 | | $0 |
| 7. | $32,536,866,483 | $13,575,389 | $32,550,441,872 | $20,251,603 | $32,570,693,475 |
| | | | | | |
| 8. Increase in Reserves | $76,811,314 | | $90,626,369 | | $92,630,422 |
| | | | | | |
| 9. GII (less ESOP interest) | $3,080,052,237 | | $3,080,052,237 | | $3,080,052,237 |
| | | | | | |
| 10.a. | $1,798,606,737 | $459,154 | $1,799,065,891 | ($117,284,509) | $1,681,781,382 |
| 10.b. | $25,665,213 | | $26,201,473 | | $26,986,593 |
| 10.c. | $4,482,525 | | $4,482,525 | | $4,482,525 |
| 10.d. | $10,101,256 | | $10,101,256 | | $10,101,256 |
| 10.f. Policy Interest | $1,838,855,731 | | $1,839,851,145 | | $1,723,351,756 |
| | | | | | |
| 11. GII - Policy Interest | $1,241,196,506 | | $1,240,201,092 | | $1,356,700,481 |
| 12. Gross Income | $8,306,127,457 | | $8,306,127,457 | | $8,306,127,457 |
| ESOP Adjustment | ($25,567,202) | | ($25,567,202) | | ($25,567,202) |
| Revised Gross Income | $8,280,560,255 | | $8,280,560,255 | | $8,280,560,255 |

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| 13. T/E Interest | $563,099 | | $563,099 | | $563,099 |
| 14. Total, l.12 + l.13 | $8,281,123,354 | | $8,281,123,354 | | $8,281,123,354 |
| 15. Increase in Reserves | $76,811,314 | | $90,626,369 | | $92,630,422 |
| 16. Total | $8,204,312,040 | | $8,190,496,985 | | $8,188,492,932 |
| 17. Ratio, l.11/l.16 | 15.1286% | | 15.1420% | | 16.5684% |
| 18. Policyholder Divs | $725,481,904 | | $780,770,114 | | $819,777,511 |
| 19. Excess Interest | $25,665,213 | | $26,201,473 | | $26,986,593 |
| 20. Dividends | $4,482,525 | | $4,482,525 | | $4,482,525 |
| 21. Dividends | $10,101,256 | | $10,101,256 | | $10,101,256 |
| 22. Charges | $125,263,653 | | $125,263,653 | | $125,263,653 |
| 23. Total, l.19 to l.22 | $165,512,647 | | $166,048,907 | | $166,834,027 |
| 24. L.18-L.23 | $559,969,257 | | $614,721,207 | | $652,943,485 |
| 25. L.17 times L.24 | $84,715,438 | | $93,080,788 | | $108,182,146 |
| 26. Policy Interest | $1,838,855,731 | $995,414 | $1,839,851,145 | | $1,723,351,756 |
| 27. Plcdr Share Amount | $1,923,571,168 | | $1,932,931,933 | | $1,831,533,902 |
| 28. Net Inv Income | $2,772,047,013 | | $2,772,047,013 | | $2,772,047,013 |
| 29. Plcdr Share Amount | $1,923,571,168 | | $1,932,931,933 | | $1,831,533,902 |
| 30. Co Share of NII | $848,475,845 | | $839,115,081 | | $940,513,111 |
| 31. Total Share Percent | 100.0000% | | 100.0000% | | 100.0000% |
| 32. Co Share Percent | 30.6083% | | 30.2706% | | 33.9285% |
| 33. Plcdr Share Percent | 69.3917% | | 69.7294% | | 66.0715% |
| 34. Plcdr Share of T/E | $390,744 | | $392,646 | | $372,048 |
| 35. L.8 minus L.34 | $76,420,570 | | $90,233,723 | | $92,258,374 |
| 36. Sec. 809 Adj | $0 | | $0 | | $0 |
| 37. Net Increase in Res | $76,420,570 | | $90,233,723 | | $92,258,374 |

**Schedule D -- Capital Gains and Losses**

| | PER RAR | ADJUSTMENTS | PER APPEALS | ADJUSTMENTS | PER CLAIM |
|---|---|---|---|---|---|
| 5. Net STCG | $72,041,975 | | $72,041,975 | | $72,041,975 |
| 10. Net LTCL | $0 | | $0 | | $0 |
| 11. Net STCG over LTCL | $72,041,975 | | $72,041,975 | | $72,041,975 |
| 10. Net LTCG | $141,528,989 | $0 | $141,528,989 | | $141,528,989 |
| 5. Net STCL | $0 | | $0 | | $0 |
| 12. Net Capital Gain | $141,528,989 | | $141,528,989 | | $141,528,989 |
| 13. Line 11 + Line 12 | $213,570,964 | | $213,570,964 | | $213,570,964 |

| Adjustments Per Appeals Settlement | | | Adjustments Per Claim |
|---|---|---|---|
| Capital Gains | | | |
| #1 -- Jackson Mall | $0 | (not 1996 issue) | |
| | | | |
| Other Income | | | |
| 90-94 #8 -- Spread | $0 | (Agreed spread adj.) | |
| 90-94 #9 -- Spread | $0 | (Agreed spread adj.) | |
| | $0 | | |
| | | | |
| Other Deductions | | | |
| #1 -- Contribution | $0 | (not 1996 issue) | |
| #2 -- Int on Def Comp | $0 | (Reserved) | $11,218,187 |
| #3 -- Mercantile | $255,022 | (Settled-use IRS #) | |
| #4 -- Depreciation | $95,586 | (Per settlement) | |
| #5 -- Roof Repairs | $8,796 | (Per settlement) | |
| #6 -- Resisted Claims | $257,498 | (Per settlement) | |
| #10 -- DI Claim Reserves | $0 | (Appeals conceded) | |
| #12 -- DI Reserves | $334,775 | (Appeals conceded) | |
| #13 -- Ordinary Life IBNR | $0 | (Appeals conceded) | |
| #23 -- section 481 | $23,647,369 | (Settled) | |
| #25 -- RDER | $0 | (Reserved) | $106,518,429 |
| 1990-94 Issue #3 | $42,091 | | |
| | $24,641,137 | | $117,736,616 |
| | | | |
| #7 -- SIA DRD | | | |
| MassMutual (to Sch A) | $18,290,596 | (Appeals conceded) | |
| MML Baystate (to Pg 1) | $463,272 | (Appeals conceded) | |
| | | | |
| Policyholder Dividends | | | |
| #8 -- Guaranteed Divs | $0 | (Reserved) | $20,720,891 |
| #9 -- Guaranteed Divs | $0 | (Reserved) | |
| #20 -- January Divs | $27,311,924 | (Appeals conceded) | |
| #22 -- DA Contracts | $79,386 | (Appeals conceded) | |
| #23 -- Other Contracts | $27,467,023 | (Appeals conceded) | |
| | $54,858,333 | | |

**Adjustments Per Appeals Settlement (continued)** | **Adjustments Per Claim**

| Reserves | Beginning | Ending | | Beginning | Ending |
|---|---|---|---|---|---|
| #11 -- DI IBNR | $7,264,144 | $19,613,161 | (IRS conceded) | | |
| #14 -- Int on Div Accums | ($4,249,626) | ($3,898,322) | (Settle per FSA) | | |
| #15 -- SWIL | ($331,675) | ($334,920) | (Reserve "PS") | $331,675 | $334,920 |
| #16 -- 58 CSO | ($1,269,098) | ($379,443) | (Reserve "PS") | $1,269,098 | $379,443 |
| #17 -- Term Conversions | $0 | $0 | (Reserve) | $12,704,653 | $15,606,700 |
| #18 -- Group Annuities | $0 | $0 | (Reserve) | $1,386,998 | $1,526,000 |
| #19 -- DA Contracts | ($2,555,126) | ($2,404,540) | (Reserve "PS") | $2,555,126 | $2,404,540 |
| #26 -- Traditional Life | $901,715 | $979,453 | (IRS conceded) | | |
| | ($239,666) | $13,575,389 | | $18,247,550 | $20,251,603 |

| Policy Interest | | | | |
|---|---|---|---|---|
| #11 -- DI IBNR | $844,756 | (Appeals conceded) | | |
| #14 -- Int on Div Accums | ($235,880) | (Settle per FSA) | | |
| #15 -- SWIL | ($14,668) | (Reserve -- "PS") | $14,668 | |
| #16 -- 58 CSO | ($36,276) | (Reserve -- "PS") | $36,276 | |
| #17 -- Term Conversions | $0 | (Reserve) | $699,337 | |
| #19 -- DA Contracts | ($159,138) | (Reserve -- "PS") | $159,138 | |
| #21 -- Required Interest | $0 | (Reserve) | ($118,193,928) | |
| #26 -- Traditional Life | $60,360 | (IRS conceded) | | |
| | $459,154 | | ($117,284,509) | |

| Equity Base | Beginning | Ending | | Beginning | Ending |
|---|---|---|---|---|---|
| #11 -- DI IBNR | ($7,264,144) | ($19,613,161) | (IRS conceded) | | |
| #14 -- Int on Div Accums | $4,249,626 | $3,898,322 | (Settle per FSA) | | |
| #15 -- SWIL | $331,675 | $334,920 | (Reserve "PS") | ($331,675) | ($334,920) |
| #16 -- 58 CSO | $1,269,098 | $379,443 | (Reserve "PS") | ($1,269,098) | ($379,443) |
| #17 -- Term Conversions | $0 | $0 | (Reserve) | ($12,704,653) | ($15,606,700) |
| #18 -- Group Annuities | $0 | $0 | (Reserve) | ($1,386,998) | ($1,526,000) |
| #19 -- DA Contracts | $2,555,126 | $2,404,540 | (Reserve "PS") | ($2,555,126) | ($2,404,540) |
| #24 -- Loss on Bonds | $0 | $0 | (Reserve) | ($78,718,878) | ($86,212,382) |
| #24 -- Loss on Stock | $0 | $0 | (Reserve) | ($1,786,750) | ($3,092,047) |
| #24 -- Resisted Claims | $0 | $0 | (Reserve) | ($162,718) | ($193,500) |
| #24 -- Mortgage Reserve | $0 | $0 | (Reserve) | ($153,516,757) | ($176,215,738) |
| #24 -- Guarantee Fund | $0 | $0 | (Reserve) | ($15,808,900) | ($13,080,500) |
| #26 -- Traditional Life | ($901,715) | ($979,453) | (IRS conceded) | | |
| | $239,666 | ($13,575,389) | | ($268,241,553) | ($299,045,770) |

**Adjustments Per Appeals Settlement (continued)**

**tments Per Claim**

**Recomputed 1995 DEA**

| | Per RAR | Per Appeals | | |
|---|---|---|---|---|
| Average Equity Base | $0 | $0 | | |
| DER | 0.0000% | 0.0000% | 1995 AEB | $2,765,275,936 |
| DEA | $0 | $0 | | 3.852% |
| | | | | $106,518,429 |
| Average Equity Base | $0 | $0 | | |
| Recomputed DER | 0.0000% | 0.0000% | | |
| Recomputed DEA | $0 | $0 | | |
| 808(f) Income/Deduction | $0 | $0 | | |

# MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY
# ADDENDUM TO 1996 CLAIM FOR REFUND

This Addendum is annexed to and forms a part of the claim for refund filed on Form 1120X by Massachusetts Mutual Life Insurance Company, hereinafter referred to as "Taxpayer." Taxpayer has overpaid its Federal income tax for 1996 by $55,666,826. It hereby claims a refund in that amount, or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amount to be refunded.

## Jurisdictional Statement

At all times during 1996 Taxpayer was a life insurance company as defined in section 816 of the Internal Revenue Code (hereinafter all references are to sections of the Internal Revenue Code as in effect for 1996, unless otherwise indicated). Taxpayer timely filed its Federal income tax return for 1996 and paid in full the tax liability reported on that return.

Upon audit of Taxpayer's return for the year 1996, a number of adjustments were proposed by the District Director's Office. Upon consideration of those proposed adjustments by the Taxpayer and the Boston Appeals Office of the Internal Revenue Service, a settlement on Form 870-AD was reached pursuant to which an overassessment of $13,831,457 in Federal income tax for 1996 was determined.

As part of the agreement reached on the Form 870-AD, Taxpayer reserved the right to file a refund claim for 1996 with respect to certain issues. Those issues form the basis for this claim for refund.

This refund claim is timely filed pursuant to section 6511(c) and 6511(d)(2), which permit a refund claim to be filed before the expiration of six months after the expiration of the period for assessment. The period for assessment for the year 1996 was extended by means of Forms 872 and (pursuant to the most recently executed Form 872) did not expire any earlier than December 31, 2004, and the period for timely filing this refund claim thus extends at least through June 30, 2005.

Statement of Claim

The refund sought in this claim for refund is based on the following issues. With respect to each issue, Taxpayer incorporates herein by reference the relevant portions of its Protest filed with the Internal Revenue Service for the years 1995 through 1997 and dated November 15, 2002. Taxpayer is entitled to prevail with respect to each of these issues for the reasons set forth below.

1. Interest on Deferred Compensation

On its Federal income tax return for 1996, Taxpayer claimed, and the Internal Revenue Service allowed, deductions for interest with respect to non-qualified plans of deferred compensation when such amounts of interest are paid to employees. However, Taxpayer is entitled to deductions for such interest as it credits the interest to the employees' deferred compensation accounts. For 1996, Taxpayer claims an additional deduction for interest credited in the amount of $11,218,187. The Internal Revenue Service has failed to allow that claim for an additional interest deduction.

While under section 404 deferred compensation may only be deducted when paid to an employee, interest is not compensation, and is thus deductible under section 805(a)(8) when Taxpayer's liability for the interest accrues. Section 404 does not for any reason prohibit the accrual of interest.

In Albertson's Inc. v. Commissioner, the Ninth Circuit originally held that a corporation could currently deduct interest credited under non-qualified deferred compensation agreements, because such interest is not subject to section 404. Albertson's Inc. v. Commissioner, 38 F.3d 1046 (9th Cir. 1993), aff'g in part, rev'g in part 95 T.C. 415 (1990). However, the Court reversed itself upon rehearing and held that such interest is nondeductible until paid to the employee, although the court stated that "the answer is far from clear." Albertson's Inc. v. Commissioner, 42 F.3d 537 (9th Cir. 1994), vacating 38 F.3d 1046 (9th Cir. 1993). Taxpayer believes that the Court's original decision is correct, and that the reasoning of such decision ultimately will prevail.

Accordingly, Taxpayer is entitled to a refund of all overpayments in tax due to the Internal Revenue Service's failure to allow the claimed interest deductions.

2. Policyholder Dividend Guarantee

Taxpayer is entitled to deduct its liability for guaranteed aggregate policyholder dividends under the recurring item exception of section 461(h)(3). In the alternative, Taxpayer claims an additional deduction on the ground that the liability satisfies the economic performance requirements of section 461(h)(1) and (2).

For 1996, two groups of policies are involved. First, the issue involves policies issued by Massachusetts Mutual Life Insurance Company ("MassMutual Policies"). Second, the issue involves policies that had been issued by Connecticut Mutual Life Insurance Company prior to the merger of MassMutual and Connecticut Mutual ("CML Policies").

As of year-end 1995, Connecticut Mutual was obligated to pay policyholder dividends with respect to CML policies, and MassMutual was obligated to pay policyholder dividends with respect to MassMutual policies. As of year-end 1996, following the merger of CML into MassMutual, MassMutual is obligated to pay policyholder dividends with respect to both the MassMutual and CML Policies.

At the end of each year, the board of directors of CML (through 1995), and of MassMutual, approved reports, submitted by management, that discussed the financial results for the current year, recommended the adoption of bases and formulae upon which policyholder dividends for individual policies in the following year were to be computed, and set forth estimates of the total amounts of divisible surplus to be paid as policyholder dividends in the following year. After these dividend resolutions were approved by the boards of directors, the total amounts of dividends payable were set aside as a liability on the annual statements. For both CML and MassMutual, the resulting policyholder dividends liabilities were reported on page 3 (Liabilities, Surplus & Other Funds) of the annual statements for those years.

For the year 1995, the boards of directors of both CML and MassMutual adopted second resolutions that unconditionally and irrevocably committed each of the companies to pay at least specified amounts of aggregate policyholder dividends in the following year. For CML the amount guaranteed was at least $97 million, and for MassMutual the amount guaranteed was at least $185 million.

For the year 1996, on December 11, 1996, Taxpayer's board of directors adopted a second resolution, applicable to both CML and MassMutual Policies, supplementing the 1996 dividend resolution previously adopted by the board of directors. In this second resolution, the board of directors determined that "the Company hereby absolutely and irrevocably commits and guarantees that, of the total [policyholder dividend] apportionment from its surplus funds for the [year 1996], it will pay or cause to be applied during [1997], in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than" $310 million.

Taxpayer is entitled to accrue its liability to pay guaranteed aggregate policyholder dividends, and is entitled to deduct that accrual. Taxpayer determined this deduction, under the recurring item exception of section 461(h)(3), as the portion of the guaranteed aggregate policyholder dividends that was paid during the 8 1/2 months after year-end. The amounts of the accrued liability and the corresponding deduction that Taxpayer originally claimed are as follows:

| **MassMutual Policies** | 1996 |
|---|---|
| Current-Year Accrual | $137,734,913 |
| Prior-Year Accrual | $125,705,981 |
| Claimed Deduction | $ 12,028,932 |

| **CML Policies** | 1996 |
|---|---|
| Current-Year Accrual | $79,507,361 |
| Prior-Year Accrual | $78,840,640 |
| Claimed Deduction | $ 666,721 |

Additional substantiation of the foregoing deductions revealed corrected amounts of aggregate policyholder dividends paid within 8 1/2 months after year-end 1996. Accordingly, Taxpayer now claims deductions for its liability to pay guaranteed aggregate policyholder dividends in the following amounts:

| **MassMutual Policies** | 1996 |
|---|---|
| Current-Year Accrual | $136,930,036 |
| Prior-Year Accrual | $118,975,383 |
| Claimed Deduction | $ 17,954,653 |

| **CML Policies** | 1996 |
|---|---|
| Current-Year Accrual | $80,191,363 |
| Prior-Year Accrual | $77,425,125 |
| Claimed Deduction | $ 2,766,238 |

At each year-end, Taxpayer unconditionally and irrevocably committed itself to pay at least the specified amounts of aggregate policyholder dividends in the following year. At each

year-end, it was known with certainty that at least the guaranteed amount of aggregate policyholder dividend liability would be satisfied in the next year by the payment of annual dividends. That guaranteed aggregate dividend liability therefore must be considered "fixed" for purposes of the "all events" test. Hughes Properties, Inc v. United States, 476 U.S. 593 (1986); Gold Coast Hotel & Casino v. United States, 158 F.3d 484 (9th Cir. 1998); Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), aff'd, 878 F.2d 86 (2d Cir. 1989). Both prongs of the all-events test are satisfied, and Taxpayer's guaranteed aggregate policyholder dividends liability is accrued.

Taxpayer is entitled to compute its aggregate policyholder dividend deduction for the year 1996 based on the recurring item exception. All four requirements needed for the recurring item exception to apply are satisfied and, under the terms of the statute, the recurring item exception must be used to account for the policyholder dividends in question.

In the alternative, Taxpayer claims that it is entitled to deduct the full amount of its guaranteed aggregate policyholder dividends liability, not merely the amount claimed under the recurring item exception, on the ground that such liability satisfies the requirements for economic performance. The amounts of this aggregate policyholder dividends liability are $282 million[1] and $310 million for the years 1995 and 1996, respectively. Thus, on this alternative basis, the amount of the deduction would be $28 million ($310 million minus $282 million).

In exchange for premiums received from its policyholders, Taxpayer provides underwriting and investment services to those policyholders. With respect to the services provided, those services are fully provided during the course of the year. With respect to Taxpayer's use of the policyholders' premiums, that use also fully occurs during the course of the year. Based on this provision of services and use of property, Taxpayer is able to determine and

[1] This $282 million amount is composed of $185 million with respect to MassMutual Policies and $97 million with respect to CML policies.

declare its policyholder dividends liability at each year end. With respect to that liability, economic performance has occurred by year end. Accordingly, Taxpayer is entitled to deduct the full amount of its guaranteed aggregate policyholder dividends liability for the year 1996.

3. Survivorship Whole Life Insurance Reserves

On its 1996 Federal income tax return, Taxpayer reported life insurance reserves for its 1984 through 1987 issues of survivorship whole life ("SWL") insurance policies computed using the 1958 CSO mortality table and a 4.5 percent assumed interest rate. On audit, the Internal Revenue Service took the position that,. for 1984 and 1985 issues of these contracts, the prevailing valuation standard is the 1958 CSO table and a 6 percent assumed interest rate. For 1986 issues of these contracts, the Internal Revenue Service took the position that the prevailing valuation standard is the 1980 CSO table and a 6 percent assumed interest rate. For 1987 issues of these contracts, the Internal Revenue Service took the position that the prevailing valuation standard is the 1980 CSO table and a 5.5 percent assumed interest rate. Based on its position, the Internal Revenue Service allowed decreased amounts of reserves. The amounts of the originally reported reserves are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $ 90,312,732 | $ 98,286,928 |

The amounts of the decreased reserves as computed and allowed by the Internal Revenue Service are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $ 89,981,057 | $ 97,952,008 |

The Internal Revenue Service has disallowed a portion of Taxpayer's reported reserves,

which were computed on the basis of the prevailing standards listed above. These reserves meet all of the requirements necessary to constitute "life insurance reserves" within the meaning of sections 816 and 807, and are properly computed under section 807. Consequently, Taxpayer is entitled to use such reported reserves in computing its reserve increase deduction and its tax due for 1996.

In addition, as a result of allowance of the reserves computed on the basis of prevailing standards listed above, Taxpayer is entitled to a corresponding adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1995 equity base under section 809(b) in the amount of $331,675 and its year-end 1996 equity base under section 809(b) in the amount of $334,920. Moreover, as a result of allowance of the reserves computed on the basis of prevailing standards listed above, Taxpayer is entitled to a corresponding adjustment increasing its policy interest under section 812(b)(2) in the amount of $14,668.

While Taxpayer should be allowed to use the reserves listed above, the Internal Revenue Service has failed to permit use of such reserves, resulting in an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

4. <u>"58 CSO" Permanent Life Insurance Reserves</u>

On its 1996 Federal income tax return, Taxpayer reported life insurance reserves for its 1984 through 1987 issues of "58 CSO" permanent life insurance policies computed using the 1958 CSO mortality table and a 4.5 percent assumed interest rate. For 1988 issues of these policies, Taxpayer calculated reserves using the 1958 CSO mortality table and a 7.77 percent assumed interest rate. On audit, the Internal Revenue Service took the position that, for 1984 and 1985 issues of these contracts, the prevailing valuation standard is the 1958 CSO table and a

6 percent assumed interest rate. For 1986 issues of these contracts, the Internal Revenue Service took the position that the prevailing valuation standard is the 1980 CSO table and a 6 percent assumed interest rate. For 1987 issues of these contracts, the Internal Revenue Service took the position that the prevailing valuation standard is the 1980 CSO table and a 5.5 percent assumed interest rate. For 1988 and 1989 issues of these contracts, the Internal Revenue Service took the position that the prevailing valuation standard is the 1980 CSO table and assumed interest rates of 7.77 percent and 8.16 percent, respectively. Based on its position, the Internal Revenue Service allowed decreased amounts of reserves. The amounts of the originally reported reserves are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $1,403,221,952 | $1,495,486,120 |

The amounts of the decreased reserves computed and allowed by the Internal Revenue Service are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $1,401,952,854 | $1,495,106,677 |

The Internal Revenue Service has disallowed a portion of Taxpayer's reported reserves, which were computed on the basis of the prevailing standards listed above. These reserves meet all of the requirements necessary to constitute "life insurance reserves" within the meaning of sections 816 and 807, and are properly computed under section 807. Consequently, Taxpayer is entitled to use such reported reserves in computing its reserve increase deduction and its tax due for 1996.

In addition, as a result of allowance of the reserves computed on the basis of prevailing standards listed above, Taxpayer is entitled to a corresponding adjustment reducing the excess of

statutory over tax reserves in the computation of its year-end 1995 equity base under section 809(b) in the amount of $1,269,098 and its year-end 1996 equity base under section 809(b) in the amount of $379,443. Moreover, as a result of allowance of the reserves computed on the basis of prevailing standards listed above, Taxpayer is entitled to a corresponding adjustment increasing its policy interest under section 812(b)(2) in the amount of $36,276.

While Taxpayer should be allowed to use the reserves listed above, the Internal Revenue Service has failed to permit use of such reserves, resulting in an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

5. Term Conversion Reserves

On its 1996 Federal income tax return, Taxpayer reported life insurance reserves under certain contracts with respect to term conversion provisions. Under these provisions, for which there was a separately identified premium or charge, the insured had the ability to convert the term policy into a permanent policy at a standard rate, regardless of any medical or physical impairment. On its return for 1996, Taxpayer reported these term conversion reserves as reserves for "qualified supplemental benefits" within the meaning of section 807(e)(3). On audit, the Internal Revenue Service disallowed that treatment, and allowed decreased amounts of reserves. The amounts of the originally reported reserves are as follows:

| | January 1, 1996 | December 31, 1996 |
|---|---|---|
| Individual | $ 39,293,953 | $ 41,239,712 |
| Group | $ 12,821,271 | $ 12,589,353 |

The amounts of the decreased reserves computed and allowed by the Internal Revenue Service are as follows:

| | January 1, 1996 | December 31, 1996 |
|---|---|---|
| Individual | $ 27,744,792 | $ 27,001,976 |
| Group | $ 11,665,779 | $ 11,220,389 |

These term conversion reserves as reported by Taxpayer meet all of the requirements necessary to constitute "life insurance reserves" within the meaning of section 816 and are properly computed under section 807. In addition, the reserves qualify as "life insurance reserves" under section 807(c)(1) and as reserves for "qualified supplemental benefits" under section 807(e)(3). Consequently, Taxpayer is entitled to use such reported reserves in computing its reserve increase deduction and its tax due for 1996.

In addition, as a result of allowance of the term conversion reserves listed above, Taxpayer is entitled to a corresponding adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1995 equity base under section 809(b) in the amount of $12,704,653, and an adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1996 equity base under section 809(b) in the amount of $15,606,700. Moreover, as a result of allowance of the term conversion reserves listed above, Taxpayer is entitled to a corresponding adjustment increasing its policy interest under section 812(b)(2) in the amount of $699,337.

While Taxpayer should be allowed to use the reserves listed above, the Internal Revenue Service has failed to permit use of such reserves, resulting in an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

6. Group Annuity Contract Reserves

On its 1996 Federal income tax return, Taxpayer reported life insurance reserves under certain group annuity contracts. Under these group annuity contracts, which are issued to employers, Taxpayer issues annuity certificates that evidence its obligation to pay annuity

benefits to retired employees. Taxpayer holds reserves with respect to its obligation to provide these annuity benefits. On its return for 1996, Taxpayer reported these group annuity reserves as life insurance reserves under section 807(c)(1). In computing these reserves, Taxpayer applied the section 807(d) "annual statement cap" by comparing tax reserves to statutory reserves at the group annuity contract level, rather than at the individual certificate level. On audit, the Internal Revenue Service required that the comparison between tax reserves and statutory reserves be made on a certificate-by-certificate basis, rather than on the group annuity contract basis. On this basis, the Internal Revenue Service disallowed a portion of the group annuity reserves. The amounts of the originally reported reserves are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $2,073,140,058 | $2,092,721,147 |

The amounts of the decreased reserves computed and allowed by the Internal Revenue Service are as follows:

| January 1, 1996 | December 31, 1996 |
|---|---|
| $2,071,753,060 | $2,091,195,147 |

These group annuity reserves as reported by Taxpayer meet all of the requirements necessary to constitute "life insurance reserves" within the meaning of section 816. In addition, the reserves qualify as "life insurance reserves" under section 807(c)(1) and are properly computed under section 807(d). Consequently, Taxpayer is entitled to use such reported reserves in computing its tax due for 1996.

Moreover, as a result of allowance of the reserves listed above Taxpayer is entitled to a corresponding adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1995 equity base under section 809(b) in the amount of $1,386,998, and a

corresponding adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1996 equity base under section 809(b) in the amount of $1,526,000.

While Taxpayer should be allowed to use the reserves listed above, the Internal Revenue Service has failed to permit use of such reserves, resulting in an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

7. Deposit Administration Group Annuity Contract Reserves

On its 1996 Federal income tax return, Taxpayer reported life insurance reserves held with respect to deposit administration group annuity contracts ("DA contracts"). Under these DA contracts, Taxpayer maintained a policyholder's fund, referred to as the "Active Life Fund" (or "ALF"). On its annual statement for the year 1996, Taxpayer reported reserves for DA contracts equal in amount to 97.5 percent of the ALF. On its 1996 Federal income tax return, Taxpayer reported tax reserves for DA contracts in accordance with section 807(d) and 807(e)(1)(B) equal in amount to 97.5 percent of the ALF. On audit, the Internal Revenue Service allowed reserves for DA contracts equal in amount to only 95 percent of the ALF. The amounts of the originally reported reserves are as follows:

| December 31, 1995 | December 31, 1996 |
|---|---|
| $ 100,110,011 | $ 94,269,833 |

The amounts of the decreased reserves computed and allowed by the Internal Revenue Service are as follows:

| December 31, 1995 | December 31, 1996 |
|---|---|
| $ 97,554,885 | $ 91,865,293 |

The basis for the Internal Revenue Service's adjustment is that the DA contracts provide for surrender charges, which must be excluded from tax reserves. However, the DA contracts do

not provide for surrender charges. The reserves as reported on the 1996 Federal income tax return meet all of the requirements necessary to constitute tax reserves and are properly computed under section 807. Consequently, Taxpayer is entitled to use such reported reserves in computing its reserve increase deduction and its tax due for 1996.

In addition, as a result of allowance of the reserves for DA contracts listed above, Taxpayer is entitled to a corresponding adjustment reducing the excess of statutory over tax reserves in the computation of its year-end 1995 equity base under section 809(b) in the amount of $2,555,126, and in the computation of its year-end 1996 equity base under section 809(b) in the amount of $2,404,540. Moreover, as a result of allowance of the reserves for DA contracts listed above, Taxpayer is entitled to a corresponding adjustment increasing its policy interest under section 812(b)(2) in the amount of $159,138.

While Taxpayer should be allowed to use the reserves listed above, the Internal Revenue Service has failed to permit use of such reserves, resulting in an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

8. <u>Required Interest</u>

On its 1996 Federal income tax return, Taxpayer reported tax reserves for certain contracts computed as the net surrender value under section 807(d)(1). With respect to these contracts, Taxpayer reported "required interest" under section 812(b)(2) using "another appropriate rate," *i.e.*, the rate reflected in the contract's guaranteed minimum nonforfeiture values. On its 1996 Federal income tax return, Taxpayer reported required interest in the amount of $393,692,486. On audit, the Internal Revenue Service increased the amount of required interest to $511,886,414.

The basis for the Internal Revenue Service's adjustment is that, under LTR 9246001

(October 30, 1991), required interest must be computed using the prevailing State interest rate even in cases where the tax reserve for a contract is the net surrender value. However, in cases where the tax reserve for a contract is the net surrender value, the rate reflected in the contract's guaranteed minimum nonforfeiture values is the "other appropriate rate" that must be utilized for purposes of section 812(b)(2).

While Taxpayer should be allowed to use the rate reflected in the contract's guaranteed minimum nonforfeiture values as the "other appropriate rate" for purposes of section 812(b)(2), the Internal Revenue Service has failed to permit use of such rate, resulting in an overstatement of required interest for 1996 and an overpayment of Taxpayer's Federal income taxes for 1996. Claim is hereby made for refund of that overpayment in tax.

9. <u>Section 809 Equity Base Adjustments</u>

Section 809 adjusts the life insurance company taxable income of mutual life insurance companies based on a comparison of the relative returns on equity of the 50 largest stock life insurance companies and all mutual life insurance companies. Section 809(a), first, provides that the deduction allowed mutual life insurance companies for policyholder dividends (and in some instances the deduction for reserve increases) must be reduced by the "differential earnings amount," which equals the "average equity base" multiplied by the "differential earnings rate." Section 809(f), second, provides for certain adjustments based upon the "recomputed differential earnings amount." Annual statement accounting treatment is controlling for section 809 purposes.

The "average equity base" for each year is the average of the equity base for that year and the equity base for the preceding year. Section 809(b)(1). The starting point for determining the

equity base for a year is the surplus and capital reported on the annual statement for the year. From this amount, certain adjustments are required, such as for "nonadmitted financial assets," for any "voluntary reserve," and for the excess of statutory reserves over tax reserves. Section 809(b).

On its Federal income tax return for the year 1996, Taxpayer properly reported its average equity base. However, the Internal Revenue Service has adjusted Taxpayer's average equity base based upon the following issues. Taxpayer disagrees with each of these adjustments.

On its 1995 and 1996 annual statements, Taxpayer wrote down the book value of certain bonds reported in Schedule D, Part I to account for the Taxpayer's "unrealized loss on bonds." Consistently, on its 1996 Federal income tax return, Taxpayer's year-end 1995 and 1996 equity bases were reduced by the amounts of the "unrealized loss on bonds." On audit, the Internal Revenue Service treated the amounts of the reduction as a non-admitted financial asset, thereby increasing Taxpayer's reported equity bases. The Internal Revenue Service increased Taxpayer's year-end 1995 equity base by $78,718,878 and its year-end 1996 equity base by $86,212,382.

On its 1995 and 1996 annual statements, Taxpayer also wrote down the book value of certain preferred stock to account for the Taxpayer's "unrealized loss on preferred stock." Consistently, on its 1996 Federal income tax return, Taxpayer's year-end 1995 and 1996 equity bases were reduced by the amounts of the "unrealized loss on preferred stock." On audit, the Internal Revenue Service treated the amounts of the reduction as a non-admitted financial asset, thereby increasing Taxpayer's reported equity bases. The Internal Revenue Service increased Taxpayer's year-end 1995 equity base by $1,786,750 and its year-end 1996 equity base by $3,092,047.

Taxpayer is entitled to its tax return treatment of the items described above. Section

809(g)(3) requires that all determinations made under section 809 "shall be made on the basis of the amounts required to be set forth on the annual statement," and Taxpayer properly reported the items described above in its annual statement. The NAIC requires that certain no-bonds be reduced in value to at least a specified value, and Taxpayer was required to reduce the value of other bonds and preferred stock that it determined to be permanently impaired during the tax year. Furthermore, generally accepted accounting principles ("GAAP") must be applied in the absence of specific rules, and GAAP requires that permanently impaired investments must be written down.

On its annual statements for 1995 and 1996, Taxpayer reported its liability for resisted death claims, and used those amounts in computing its year-end 1995 and 1996 equity bases. On audit, the Internal Revenue Service disallowed a portion of Taxpayer's reported liability as a deduction for income tax purposes and made a related adjustment to the year-end 1995 and 1996 equity bases, treating a portion of such liability as a voluntary reserve. The Internal Revenue Service increased the year-end 1995 equity base by $162,718 and the year-end 1996 equity base by $193,500. The Internal Revenue Service improperly increased the year-end 1995 and 1996 equity bases by such resisted claim amounts. The Internal Revenue Service incorrectly substituted tax accounting standards for annual statement accounting rules. Life insurers are required to establish liabilities for resisted claims. In fact, various schedules to the annual statement make specific reference to resisted claims. Thus, the adjustments made to the equity bases should be reversed, and the section 809 equity bases should be reduced by the amounts in issue.

On its annual statements for 1995 and 1996, Taxpayer established a mortgage loan reserve and a real estate reserve. The mortgage loan reserve reflects, for mortgage loans in

default, the excess of the outstanding debt over the expected value of the collateral property. The real estate reserve reflects, for depreciated property, the excess of book value over market value. Taxpayer reflected those amounts in computing its year-end 1995 and 1996 equity bases. On audit, the Internal Revenue Service made an adjustment to the year-end 1995 and 1996 equity bases, treating such reserves as voluntary reserves. The Internal Revenue Service increased the year-end 1995 equity base by $153,516,757, and the year-end 1996 equity base by $176,215,738. The Internal Revenue Service improperly increased the year-end 1995 and 1996 equity bases by such reserve amounts. The Internal Revenue Service incorrectly substituted tax accounting standards for annual statement accounting rules. Life insurers are required to establish these reserves. In fact, instructions to the annual statement make specific reference to these reserves. Thus, the adjustments made to the equity base should be reversed, and the section 809 equity base should be reduced by the amounts in issue.

On its annual statements for 1995 and 1996, Taxpayer established a liability for guarantee fund assessments. This liability reflected Taxpayer's obligation to pay assessments made by insurance regulators due to insurer insolvencies. Taxpayer reflected this amount in computing its year-end 1995 and year-end 1996 equity bases. On audit, the Internal Revenue Service made an adjustment to the year-end 1995 and 1996 equity bases, treating such liability as a voluntary reserve. The Internal Revenue Service increased the year-end 1995 equity base by $15,808,900 and the year-end 1996 equity base by $13,080,500. The Internal Revenue Service improperly increased the year-end 1995 and 1996 equity bases by such amounts. The Internal Revenue Service incorrectly substituted tax accounting standards for annual statement accounting rules. Thus, the adjustment made to the equity bases should be reversed, and the section 809 equity bases should be reduced by the amounts in issue.

Lastly, based on various reserve adjustments that are characterized as erroneous adjustments in this and related refund claims, the Internal Revenue Service has increased Taxpayer's section 809 equity bases for year-end 1995 and 1996 by the excess of statutory reserves over tax reserves. Because those reserve adjustments are erroneous for the reasons described in this and related refund claims, there is no such excess, there is no basis for such adjustment.

Based on the foregoing, claim is hereby made for refund of all overpayments in tax due to section 809 equity base adjustments.

10. Negative Recomputed Differential Earnings Rate

Section 809 requires each mutual life insurance company to compute a differential earnings amount ("DEA"). The DEA for a year is the product of the mutual company's "average equity base" for the year multiplied by the differential earnings rate ("DER") for the year. Section 809(a)(3). The DEA for a year is reported on the mutual company's Federal income tax return for that year, and it affects the company's taxable income for that year by affecting the policyholder dividends deduction (and, if necessary, the closing balance of reserves). Sections 808(c)(2), 809(a)(1) and (2).

A mutual company's DEA for a year is recomputed on its Federal income tax return for the following year. In that following year, the recomputed DEA is determined as the product of the mutual company's "average equity base" for the prior year multiplied by the "recomputed DER" for the prior year. Section 809(f)(3). In that following year, any increase or decrease of the recomputed DEA for the prior year over the originally computed DEA for the prior year is either included in income or deducted. Section 809(f).

On its 1995 Federal income tax return, Taxpayer reported a 1995 DER in the amount of zero percent, and reported a 1995 DEA of $-0-, computed as the product of its 1995 average equity base times the 1995 recomputed DER. This 1995 DEA of $-0- had no impact on Taxpayer's allowable policyholder dividends deduction for the year 1995.

On its 1996 income tax return, Taxpayer reported a 1995 recomputed DER in the amount of zero percent. Subsequently, in an audit file submission for 1996, Taxpayer claimed a 1995 recomputed DER in the amount of negative 3.852 percent, and reported a 1995 recomputed DEA of negative $106,025,946, computed as the product of its 1995 average equity base times the 1995 recomputed DER of negative 3.852 percent. Taxpayer claimed a section 809(f)(2) deduction in an amount equal to the difference between its initially computed 1995 DEA ($-0-) and the 1995 recomputed DEA (negative $106,025,946). Accordingly, Taxpayer claimed a section 809(f)(2) deduction of $106,025,946 for the taxable year 1996.

The Internal Revenue Service takes the position that the 1995 recomputed DER cannot be less than zero. Based on this contention, the Internal Revenue Service failed to allow Taxpayer's claimed deduction of $106,025,946 under section 809(f)(2) for 1996.

A strict application of the formula in section 809 produces the negative values in dispute. The Service itself has acknowledged this fact. See Announcement 88-47, 1988-12 I.R.B. 56 (announcing a 1986 recomputed DER of (1.7%)); T.D. 8499, 1993-2 C.B. 246 (acknowledging that the calculated rate was negative). While section 809 is generally intended to reduce policyholder dividend deductions, its purpose is not to do so haphazardly and arbitrarily. Section 809 produces the correct result over time only if negative values are recognized. If negative values are not recognized, the result will be to disallow a greater portion of policyholder dividend deductions than can be justified under the theory of section 809. Such a result would be

contrary to Congress' intent in enacting the statute.

It is true that in American Mutual Life Ins. Co. v. United States, 43 F.3d 1172 (8th Cir. 1994), Indianapolis Life Ins. Co. v. United States, 115 F.3d 430 (7th Cir. 1997), and CUNA Mutual Life Ins. Co. v. United States, 97-2 U.S.T.C. ¶ 50,904 (Fed. Cl. 1997), courts have held that the recomputed DER may not be less than zero. However, Taxpayer believes that those decisions are incorrect.

Based on the foregoing, Taxpayer is entitled to the allowance of a deduction under section 809(f)(2) for the taxable year 1996. The amount of the deduction allowable, based on a negative 1995 recomputed DER of (3.852%), and a 1995 average equity base of $2,765,275,936 (per Taxpayer's refund claim filed for the year 1995[2]), equals $106,518,429. Accordingly, Taxpayer is entitled to the allowance of a $106,518,429 (or some other amount, as properly computed) deduction under section 809(f)(2) for the taxable year 1996.

Alternatively, Taxpayer is entitled to exclude from income, under the tax benefit rule, the amount associated with prior year deductions that, due to the disallowance of negative recomputed DERs, did not produce a tax benefit to the Taxpayer. This amount must be excluded from income for 1996 because it constitutes a "recovery" and is based on "fundamentally inconsistent" events for purposes of the tax benefit rule.

## 11. Additional Claim Based on Credits and Credit and Loss Carryovers and Carrybacks

In subsequent computations, Taxpayer hereby claims its right to fully utilize all credits

[2] The amount of the 1995 average equity base may change as various other issues are resolved for the years 1994 and 1995.

that arise in 1996 and all credit carryovers and carrybacks to 1996 from other years, to the extent such credits are available. In subsequent computations, Taxpayer also claims its right to fully utilize all operations loss and capital loss carryovers and carrybacks to 1996 from other years, to the extent such carryovers and carrybacks are available.

12. Interest Netting

The Taxpayer claims that it is entitled to have its deficiency interest with respect to the year 1996 calculated in accordance with the interest netting procedures provided under section 6621(d).

13. Interest Calculations

The Taxpayer claims that it is entitled to have its deficiency interest with respect to the year 1996 calculated in accordance with the "use of money" principles set forth in the *Sequa* and *May Department Stores* cases and Revenue Ruling 99-40.

14. Minimum Premium Plan

On its Federal income tax returns for prior years, Taxpayer excluded "supplemental premiums" with respect to minimum premium plans from its premium income, and made consistent adjustments to death benefits and reserves.

During the year 1995, the minimum premium plan line of business was reinsured to MMLPension, and MMLPension continued to take the position that supplemental premiums were not accrued and should not be included in income. During the year 1996, the minimum premium plan line of business was sold to an unrelated third party.

For years before 1995, Taxpayer has claimed that the Internal Revenue Service's

adjustments with respect to minimum premium plans are erroneous and should be rejected. As of the date of the filing of this refund claim, that controversy was not resolved. In the event that Taxpayer does not ultimately prevail with respect to that controversy in pre-1995 years, Taxpayer makes this protective claim for adjustments for the year 1996 that are consistent with the resolution of the minimum premium plan issue in pre-1995 years. Such adjustments may involve the reversal of year-end accrual balance and liability balances. Such adjustments also may involve the application of the tax benefit rule and other legal and equitable doctrines that may apply, including those that may reinforce and supplement the tax benefit rule.